Good morning, Your Honors. My name is Dave Taylor, and I represent Secura Insurance Company and Molitor Brothers Farms in this appeal. As Your Honors probably know, this appeal presents a fairly straightforward breach of express warranty type claim, some contractual But it's really a broader case than that, because it's a case that involves essentially every citizen within our circuit, and specifically farmers. Farmers from Minnesota, which are the subject of this case, but farmers whether they're in Arkansas, Nebraska, Iowa, or any other state in this circuit. And so that's why it's important. We've presented a number of different issues that we believe are ripe for appeal and should be reversed and remanded as a result. The first set of issues comes from the court's ruling at the Rule 12 stage here at this case. As you know, this case was brought as a fire case on a tractor alleging a breach of express warranty, and it was an allegation of defective design and manufacture for the tractor. A motion for partial dismissal was brought by the appellee, arguing that if there is any portion of the plaint that is based on design defect, that it should be dismissed. The court, we believe, committed reversible error in that hearing by failing to follow Rule 12 procedure. As the court knows, the Rule 12 procedure is to take all facts pled and any inference drawn from that in favor of the plaintiff, and that was simply not done in this case. On page 67 of our record, we indicate the first instance where the court recognized that the plaintiff had pled and quoted deposition testimony from the appellee, outlining its warranty procedure, making no distinction between manufacturing or design defects, that that testimony was quoted within the complaint, acknowledged by the court, and then simply ignored. That quote is on page 67 of the court's transcript in our appeal, or in our appendix. Had the court looked into those facts, it would have understood that the appellee's behavior, the appellee's conduct, gives rise to another reasonable interpretation of this warranty. Beyond that, the court ignored facts that were pled in the complaint, alleging that in this case, the machines were defective because feasible safety features were left off. Had the court looked into those facts and had recognized that Minnesota law governs this case from a substantive standpoint, that the Minnesota Supreme Court had spoken on that issue in the 1984 Belotta decision, stating that it was an impermissible delegation of a product manufacturer's duty to make feasible safety features optional. That was pled. It was not addressed by the court at the Rule 12 stage. Both of those were violations of Rule 12 procedure, and we believe constitute reversible error, because had that been done properly, the court would have come to the conclusion that the warranty before it was ambiguous, which is exactly the opposite of what they held. So, counsel, are you saying that under Minnesota law, we have to read the word manufacturing as including design defects that are safety-related? It seems to me there is a distinction between manufacturing and design, unless you're saying that under Minnesota law, if it's related to safety, you have to interpret manufacturing as including design defects. Your Honor, I don't believe that the Belotta court made that distinction. The Belotta court held that it was the duty of the product producer. It referred to it as a manufacturer. It referred to it as a designer, and it referred to it as a producer, without distinction. So if there is an instance, which we believe this case presents this type of instance, where an intentional decision, whether it's a manufacturing decision or a design decision, but an intentional decision is made where a feasible safety feature is made optional, that's in violation of Minnesota law by way of Belotta. But it's also a breach of the warranty that sits before this court. This warranty actually contemplates this type of scenario. In the section of the warranty, which is page 10 of our appendix, the warranty specifically says, on page 10 of the appendix, the warranty specifically says, to the extent legally required, any implied warranties or conditions shall be limited in duration to the applicable period of warranty set forth on this page. The condition that applies here is set forth in Belotta, and that condition is that it's impermissible for a product manufacturer to delegate their duty to produce a reasonably safe product by making feasible safety features optional. It's recognized by the only controlling precedent involved in this case, the Minnesota Supreme Court, the Belotta decision, and it's recognized in the very terms of the warranty. Had the court looked at all of the terms of the warranty, we believe that it would have come to that conclusion, but it didn't do that, and that analysis should have been done. The express warranty says that they have to repair or replace, at their option, any part covered under these warranties which is found to be defective in material or workmanship during the warranty term. That's correct. And as I understand, all other warranties are disclaimed, right? There is a provision within there where they've disclaimed implied warranties. So how does this safety feature fit as something that could be repaired or replaced because of a defect in material or workmanship? Well, I think that that's an important point, Your Honor. I think that the warranty itself, by way of its terms, is inconsistent in the type of defects that it touches. That's one provision. Certainly the provision of this covers component parts that are found to be defective in materials and workmanship. That's the controlling phrase. But there's other phrases within the warranty, the one that I just cited, that recognize that there may be situations where this warranty might not be limited as intended by the drafter. That provision that I just read certainly accommodates the Belotta decision. The other provisions within the warranty that seem to indicate that that phrase is not limited to manufacturing defects are, in the very last portion of the warranty, it says this warranty gives you specific legal rights, and you may also have other rights which may vary from jurisdiction to jurisdiction. This is being argued right now, the warranty is being argued as a limitation of rights. A purchaser of a product, purchase not pursuant to a contract, would always have the common law claim of being able to break a manufacturing defect or a design defect if the product was being argued that we can no longer bring that design defect claim because of the limitation that is being read within this warranty. The very last sentence, this warranty gives you specific legal rights, stands in complete contradiction to that argument. And by way of that, makes this ambiguous. But isn't the limitation the disclaimer of all other warranties? Isn't that where the limitation comes in? The limitation comes in in the exact same language that I read to you in regards to there being conditions in certain jurisdictions where that limitation may not apply. And Belotta fits within that condition. The larger limitation, Your Honor, which is the larger argument and what the Court found at the Rule 12, is that this warranty was unambiguously limited to manufacturing defects, which we take issue with. We believe that if the Court had engaged in the proper contractual interpretation and analysis, it would have come to a different conclusion. As this Court has said, we are to look at these contracts as the mass of humanity is to look at them. Because we can safely assume that that's how the parties looked at them when they entered into them. And so this is a contract where a farmer comes into a retail establishment, invests five or $600,000 into a piece of capital investment for their farm. And that's the context that the Court needed to look at it. They didn't. The Court looked at the one phrase that Your Honor cited and nothing more. Well, the two phrases. The one phrase, the material workmanship and defects, and then also the limitation of implied warranties. They did not look at the title. The title applies to the product as a whole. They did not look at, and in this case, they didn't have the benefit of, the record that this Court has. In this case, we deposed Troy Schick, which is the only witness or deponent offered by the defendant in this case. He was offered both as a corporate representative, as an expert witness, and as a fact witness. As a John Deere customer, Mr. Schick testified that he thought there would be warranty coverage for design defects. On the very last page of our appendix, page 1088, Mr. Schick testifies, if there's a design problem with a vehicle that causes a wheel to fall off and then additional damage, then I think it would, then I would expect some help with warranty with getting it repaired and getting a change made to address that. But that's if there's a design problem was discovered. So the common understanding when purchasing a product like this is that design is covered. The phrase that Your Honor has identified and that the district court relied on simply does not limit the warranty to manufacturing defects, or it certainly doesn't do so in an unambiguous fashion, because if it was, if that was the intent of the parties, it would simply say that. This warranty is limited to manufacturing defects. There are very clear ways to communicate that intent. The drafter of this warranty did not choose that clear option. There are other ways in which that could have been communicated even within the text of this warranty. For instance, there's a section within this warranty entitled, what is not covered. If it was the intent of the drafter to exclude the design from this warranty, that would have been the perfect place to specifically state that. It's not there. Interestingly, the appellee cites two different cases, Dykes and Thomas, in support of its argument that this court is supposed to read this warranty as a whole, giving its plain and ordinary terms. But both of those cases talk about looking for limitations within, in one case, a settlement agreement, and in another case, a commercial insurance policy. Both of those courts said, those limitations are not within this contract, and we are not going to read them in. That is what the appellee is asking this court to do. There is no limitation within this contract that specifically carves out design defects. The common understanding is that this title, you're purchasing the product as a whole. You're not purchasing a set of parts or an instruction manual as to how to put those parts together. You're purchasing the design, the manufacturer, the product. We know this because the appellee says in the very first sentence of their brief that they are in the business of designing, manufacturing, and selling farm equipment. That is what we purchase. That's what they rely on when they walk into the implement dealer and they want to buy a new tractor or combine. Had the court engaged in the proper Rule 12 procedure at the motion for partial summary judgment, we believe that the court would have come to the conclusion that this is a warranty that is ambiguous in its breadth. The cases relied upon by the court are distinguishable. The Bruce Martin case, that case, this court specifically analyzed the nature of the parties involved in that case in coming to its conclusion. It specifically stated, Bruce Martin specifically stated that because Bruce Martin and CTV are merchants of dangerous goods who are likely familiar with products liability, it seems reasonable that the parties may have implicitly incorporated understandings from products liability doctrine into their contract. That analysis was not done here. Had it been done, the court would have had to have tried to find some implicit basis to conclude that the Molitor brothers had an intimate understanding with product liability law. They don't. It's not in the record. It wasn't done and it shouldn't be upheld here. The other case relied upon by the court is the Hardy-Planck case. The Hardy-Planck case, contrary to what is being argued by my friends across the aisle, it actually specifically excludes manufacturing defects or limits the warranty to manufacturing defects. The court states on page 934 of its opinion, the limited warranty exclusion section, section three, excludes from coverage damages for defects resulting from any cause other than manufacturing defects attributable to Hardy. That is the type of clear statement that is missing from this warranty. Had it been there, we probably wouldn't be here because then it would be an unambiguous contract.  And as a result, it's ambiguous. Thank you for your rebuttal. Do you want to reserve some time or not? I do, Your Honor. Thank you. Thank you. Good morning, Your Honors, Counsel. May it please the Court, my name is Amanda Heights. I'm here on behalf of Deere and Company. I want to address three things today. First of all, we're going to talk about the most important document in this case, which is the warranty, which everything rises and falls on. I'd also like to address some clarifications that are needed in the record and then how the economic loss doctrine relates to this all if we have time. Although, from our briefings, you understand Deere's position is that the ELD doesn't really have a place in this case. Unless the Court would like me to focus on anything else, I'm going to start with reading the warranty. Today is the first time we've heard an allegation that the Deere warranty is in any way ambiguous. In Deere's answering brief, it was pointed out that this was an unambiguous warranty and we were told that there was no finding of unambiguity in the reply brief. Indeed, the Deere warranty is unambiguous. The general provisions state that John Deere will repair or replace at its option any part covered under these warranties which is found to be defective in material or workmanship. That is what the warranty says. There's never been an argument that the terms material or workmanship means anything other than a manufacturing defect. Manufacturing defect and materials and workmanship have been found to be synonymous. There's a number of case sites in our briefings. Molitor equipment has not identified any case anywhere that has found that a defect in material or workmanship means something other than a manufacturing defect. The warranty goes on to say that any service or maintenance not directly related to any defect covered under these warranties is the responsibility of the owner. We go to what is not warranted. Damage caused by failure to follow operating instructions, recommendations, misuse, lack of proper protection, vandalism, the elements or accident. Then there's the no implied warranty representation or condition. Let's focus for a moment on the disclaimer of implied warranties. When you serve a national customer base, there is a necessity to recognize that laws do vary across jurisdictions. Laws vary with regard to warranty across jurisdictions. For example, implied warranties, some states allow you to disclaim them. Some states do not. The state of Minnesota allows you to disclaim an implied warranty. Some states require privity. Some do not. Counsel, why is it that some states do not allow manufacturers to disclaim those implied warranties? It's a policy decision on behalf of the legislature. It's usually within the UCC. And isn't it because it's just really unfair to buy a very expensive piece of equipment that's not fit for its intended use and not be compensated? No, Your Honor, because the implied warranties are generally considered a buyer-seller remedy, and a lot of states don't allow you to sue a manufacturer at all under implied warranty. The reason that they can't be disclaimed is sometimes there is a recognition of a power imbalance between a buyer and a seller when it comes to your ordinary goods and your ordinary customers. There's also the issue of some states, how they've treated the development of strict liability vis-a-vis implied warranty and whether they merge or don't merge. So we return to our implied warranty representation and condition. DEER has to recognize that in different states there will be different laws that apply. And some states do provide different rights. California is a notable example. California has the Song-Beverly Act, and that covers warranted goods. It's separate from the Magnuson-Moss Warranty Act, and it does provide consumers different remedies. There's also consumer remedy provisions in nearly every state when it comes to consumer fraud and other issues like that. And depending on how a statute is written, it varies on whether you can address a manufacturer through a lawsuit like that. So DEER absolutely has to recognize and include in its warranty this idea. Otherwise, it could be accused of misleading a customer. It does not mean, as Molitor Brothers Equipment is suggesting, that the implied warranty disclaimer takes upon itself all elements of strict product liability, which is exactly what the argument that the condition... I think Mr. Taylor's argument might be, and I'm curious what your response is, is that the Bellota case, the Minnesota Bellota case, sort of suggests that you can't disclaim a safety-type question. I think, and I'm not 100% certain what his argument was, I understood his argument to be that the implied warranty condition would be essentially Bellota and that you're right, that you can't disclaim a safety concern. Bellota is a case, it's a strict liability case, and it's about finding that failure to equip a product with a device that renders the product unreasonably dangerous and defective. You can't delegate that to a consumer and say, I'm scot-free under strict liability. We're not talking about strict liability, though. We're talking about implied warranties. Implied warranties and strict liabilities are two different concepts in the state of Minnesota. And if we were to say that implied warranty subsumes all of strict liability, it would eviscerate the distinction between tort and contract. And we know for a fact that the Minnesota legislature has chosen to keep the strict definition of tort and contract by adopting the economic loss doctrine. That it would eviscerate, number one, the ability of a manufacturer to disclaim implied warranties, which is in Minnesota law, and it would also be fundamentally opposed to the decision to say that in cases arising out of contract, here are your revenues, and in cases arising out of tort, here is where you have a tort. And that's what the economic loss doctrine does. So the DEER warranty is internally consistent. It's unambiguous. And the court did read it in context in its whole. If you read the court's ruling on the motion to dismiss, the district court does go through the warranty and notes these consistent provisions. Turning to reading this warranty in light of extrinsic evidence, as DEER has made clear in its briefing, you don't reach extrinsic evidence on an unambiguous contract. And this contract is unambiguous. There's no other way to read it. You don't get to go search for a new meaning by looking to extrinsic evidence, which is what these depositions are, the deposition testimony. So the deposition testimony cited in the complaint, this is from a different case, and it does not say that DEER's warranty covers manufacturing defects and design defects. It discusses the process for receiving warranty service. And the reason it was there is because there was another cause of action below. The cause of action, or theory of claim, sorry, not cause of action, was that DEER breached its warranty in how it handled the warranty claim, that it put onerous and unstated obligations on the customer. Now, on appeal, we're trying to repurpose that testimony and saying, no, no, that testimony meant that a customer could read this and say DEER's warranty covers design defects. There's nothing about that testimony that supports that. Then moving to the summary judgment evidence, which would include the deposition testimony that Moldover Equipment was citing previously, that was one person's subjective wants, what he would want to have happen. And, of course, when something you buy goes, something goes wrong with it, of course you want something. I want lots of things, but it doesn't make it in the warranty, and it doesn't make it the law. Counsel, did this, the tractors here, were they purchased through a dealer? They were. And I think I noted in the record there was some discussion about the decision of DEER not to add the fire shield, and one part of that was to leave it as a matter between the purchaser and the dealer. Is that correct? Not exactly. As an add-on. I think I remember the word add-on. Not exactly. Okay, so that's one of the factual issues that I did want to address. The tractors at issue here are called the 2018.5 special model year, and they're a special model year that was created as DEER was turning over its equipment to prepare for the 2019. The 2019 model was designed to have these side shields on it, and the frames have those. I think I don't want to interfere with your own use of your time, but I think we read all that in the record, really. My question is, is there some other set of remedies that you would envision existing here between the purchasers here and the dealer having to do with the failure of the dealer to add the heat shields? Well, the heat shields weren't available when Molitor Equipment purchased the tractors. Their availability came out later after they'd owned them for a while. Weren't the holes in place? The holes were in place, but the side shields had not been released, and it required a lot of rebuilding of the tractor to fit it. The only reason the holes were there is because the holes were going to be used in the 2019, and you could use this frame component to fit the other features of the 2018.5 as you would for a 2019. So, the holes were there, but they were essentially superfluous holes. So, is there some document in the record that was given to the purchasers that discusses the availability and perhaps in the future of the shields or why there are holes in the chassis or in the engine of the tractors? No, not at the time of purchase. So, I think now would be a good time to address some of the factual discrepancies that come up in the briefings. So, in Secura's opening brief, or answering brief, no, we have the answering brief, sorry, opening brief, they say that Deere discovered there was a fire risk, and this was a newly discovered risk. That's patently untrue. What Deere put in the instructions for use for these tractors was a requirement to clean out the engine compartments, that the buildup of debris and organic materials could cause a fire risk. It was something that was made known. The heat shields were something that were added later to a different model. So, this wasn't new, and it wasn't as if Deere was going along and saying, oh, no, there's something wrong with this tractor. It's, hey, there's a possibility that we could put this part that came on a later model onto an earlier model. It's going to require some adjustments, but we understand that some customers may want this. Some customers may not. So, I think that touches again a little bit on the timing issue of this. Another factual issue is that the 2018.5 and the 2019 were not made at the same time. The only citation in the record, and Sakura's brief for that, is their own expert's report, which says that they were both put out in the fall. That does not mean they were made at the same time, and they weren't made at the same time. That's not in the record. Deere does not make two tractors at the same time. It does not make 2018.5 and 2019 on parallel production lines. 2018.5 ended, 2019 began. 2018.5 had some of the tooling for the 2019, but they were not simultaneously produced as alternative designs. There's also statements that the tractors were properly used and being used properly. Sakura's own expert says that the cause of the fire was buildup of debris in the engine compartment. Deere's warnings say, don't let debris build up in the engine compartment. You must clean it out during work. Okay. Counsel, isn't that kind of like telling the farmer, don't let the wind blow? It's telling the farmer, when the wind blows, you need to sweep it out. It's not saying, don't let the wind blow. All right. If there are no further questions, I'm out of time. Very well. Thank you. Very briefly, just to address a couple of the factual issues. The issue in regards to the timing of the side shields is a question of when they became feasible. And they became feasible at the same time that the 2019s were being made. The reference points for your honors are on page 461, there is an indication from the appellee that the ship date, meaning the day that they were actually shipping the 2019s out was 4 December of 2018. The earlier testimony from the appellee was that the date for the 2019s being manufactured was the fall of 2018. That's on page 433 of our appendix. And then on page 860, there is discussion in regards to the subject tractors being completed in the fall of 2018 at the same contemporaneous time as the 2019s going out. And so if the 2019s are having this as standard equipment, the feasibility of these safety features is apparent because they're being made at the exact same time. In regards to the economic loss doctrine, just very briefly, and that is why this case is important, is because the court's ruling at the Rule 12 stage has created this pocket of immunity for defectively designed machines. And what that does is that forces the property carriers for farmers to serve as the de facto warrantors for defectively designed machines. And that's a system that was not set up that way by the insurance business, by the farmers, or the product manufacturers. And that's because these contracts are not interpreted that way. Your time has expired. Thank you.